I .STEVEN R. PLOTKIN, Judge.
The issue in this appeal is whether there was sufficient evidence to support defendant’s conviction for first-degree murder.
PROCEDURAL HISTORY
Elton Coleman was charged by bill of indictment with first-degree murder in violation of La. R.S. 14:30(A)(3)’. At his arraignment he pled not guilty. After hearings, the trial court found probable cause and denied the motions to suppress the identification and to quash the indictment. A trial begun on March 27, 2000, resulted in a hung jury. After trial on July 16-17, 2001, a twelve-member jury found the defendant guilty as charged. The defendant filed a motion for a new trial, which was denied. After waiving all delays, Coleman was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The defendant’s motion to reconsider sentence was denied.
STATEMENT OF FACTS
At trial Detective Calvin Brazley testified that on March 19, 1998, he investigated a murder, which occurred on the corner *376 of St. Roch and North Villere Streets. A parade had just passed that intersection, and people were standing on the neutral ground, in the street, and on the sidewalk. The officer | Pnoted a vehicle stopped on the sidewalk against a house; the engine was still running. A man, later identified as Lloyd Conley, was stretched out on the sidewalk on North Villere Street. A second victim, Terrence Harrison, was found about one and a half blocks away. Several bullet casings were found on the neutral ground at the intersection as well as on St. Roch Street. The detective met with Corey McBride, an eyewitness to the events, who reported that a man named “Elton” sporting long side burns committed the murder. The detective also noted that the vehicle, which had struck a house at the corner, had bullet holes in the windshield, the side and the back. Two weeks later, the detective met with Corey McBride to show him a photo lineup; McBride selected the photo of Elton Coleman and named him as the gunman who killed Lloyd Conley.
Dr. Paul McGarry, an expert in forensic pathology, testified that he performed the autopsy on Lloyd Conley. The doctor found the cause of death to be a gunshot wound that entered Conley’s back and went through his lungs and heart. Massive internal bleeding resulted from this wound. A second bullet hit his head but that wound was not fatal. The victim also had lacerations on his chin, knees, forehead and shoulder as a result of falling on a rough surface. A person with the type of injury suffered by Lloyd Conley would not drop to the ground immediately, but would be able to walk for a block or more. Dr. McGarry reported that laboratory tests indicated that the victim had a blood alcohol level of .01, a minimal amount; he also had morphine, a heroin derivative, and cocaine present in his body .at the time of his death.
Sergeant Byron Winbush, an expert in examination of firearms, testified that when he examined the cartridge cases recovered from the crime scene. He found nine-millimeter and thirty-eight millimeter bullet jackets. He opined that the nine-millimeter casings were fired from a semiautomatic pistol and the | ¡¡thirty-eights were fired from a revolver. He found no thirty-eight-caliber casings and reasoned that they were probably not ejected from the revolver.
Corey McBride testified that he, his best friend, Lloyd Conley, and another friend, Terrence Harrison, drove a Ford Explorer to the parade. They spent time there, but when Lloyd Conley noticed the defendant nearby, Conley said, “let’s just go,” and the men got into the van. McBride was in the back seat, Conley was driving, and Terrence Harrison was in the front passenger seat. Conley drove down St. Roch Street but could not move well because of the crowd. Corey McBride saw the defendant walking up to the truck with his hand in his pocket. Then McBride saw Coleman pull out a gun and begin firing. McBride “ducked” to the floor and yelled, “go, go, go,” but the truck did not move. McBride stayed on the floor of the backseat until the bullets stopped. When he got out of the truck, McBride realized that Terrence Harrison and Lloyd Conley were already out of the vehicle. McBride began to run and shots rang out again. He saw Harrison slip, but he kept running. He ran around a corner with the defendant following him. McBride ran to the Mc-Donalds on Franklin and St. Claude Avenues. At that point the defendant ran straight across Franklin Avenue on Urquhart Street.
McBride described Elton Coleman as having very long sideburns. McBride stated that although the defendant was not *377 from his neighborhood, McBride saw him almost every day. Corey McBride admitted to having two convictions for possession of guns. The first occurred when he was holding a gun for a friend and got caught with it. , The second happened after the murder at issue in this case. McBride also acknowledged that he left the state after Lloyd Conley was killed because he was “scared for his life.” Corey McBride stated that Elton Coleman shot and killed his best friend, Lloyd Conley.
Under cross-examination, McBride said he had his head down when the shooting began and did not actually see the defendant shoot the gun. He also Ldescribed hearing “lots of shots,” and concluded that the gun he saw the defendant pulling out could not have gone off that fast. McBride identified the gun he saw in the defendant’s hand as a black semi-automatic pistol.
Terrence Harrison testified that the victim was a life-long friend and that he has known Corey McBride for a few years. The shooting incident occurred while the young men were watching an Indian parade. The three were standing on the neutral ground when Harrison went to a nearby store for beer. As soon as he returned, the other two said they wanted to leave for another parade. They got into the vehicle and shots ran out. Harrison, who was in the front passenger seat, ducked under the dashboard, then got out of the van, and ran. He saw Lloyd Conley, who was running beside him, fall to the ground. Then Harrison “caught a bullet in the back.” He testified that the next thing he remembered was waking up in the hospital. Besides the gunshot wound, Harrison suffered five broken ribs and a punctured lung. Terrence Harrison stated that he did not see the defendant at the parade nor was he warned about the defendant’s approaching with a gun. When asked if he believed that more than one person was shooting, Harrison answered that he heard two different shots. Terrance Harrison’s medical record was introduced into evidence; it showed that he had used cocaine and heroin on the day he was shot. He denied using heroin but admitted to using cocaine.
Detective Greg Hamilton testified that he was the first officer on the crime scene and he wrote the initial report.[1] He observed the body of Lloyd Conley and realized that he was dead. He also knew there was a second victim and ordered ambulances for both men. Detective Hamilton stated that he never knew of Corey RMcBride as a witness or participant of this crime. The detective wrote a report in which McBride is not mentioned. However, Hamilton recused himself from the case as soon as he saw the victim’s body because he thought the deceased man was his nephew. When Detective Brazley was interviewing McBride, Hamilton was in a police car telephoning his mother to inquire about his nephew.
ERRORS PATENT
A review of the record shows no errors patent.
ASSIGNMENT OF ERROR
In a single assignment of error, the defendant argues that the evidence is constitutionally insufficient to support his conviction because the State failed to establish beyond a reasonable doubt that he committed the crime in question.[2] In State v. *378 Brealy, 2000-2758 (La.App. 4 Cir. 11/5/01), 800 So.2d 1116[3], this Court considered a similar argument and stated:
The Due Process Clause of the Fourteenth Amendment protects a person accused of a crime from being convicted unless the State proves every element of the offense charged beyond a reasonable doubt. This constitutional protection is the basis of a reviewing court’s duty to determine the sufficiency of the evidence used to convict a defendant. State v. Monds, 91-0589 (La.App. 4 Cir.1994), 631 So.2d 536. In deciding whether evidence is constitutionally sufficient to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
The appellate court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305, 1311 (La.1988); State v. Monds, supra, p. 4, 631 So.2d at 539. If the | ^reviewing court finds that no rational trier-of-fact, viewing all the evidence from a rational pro-prosecution viewpoint, could have found the defendant guilty beyond a reasonable doubt, the conviction cannot stand constitutional muster. Mussall, supra. When identity is disputed, the state must negate any reasonable probability of misidentification in order to satisfy its burden to establish every element of the crime charged beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Smith, 430 So.2d 31, 45 (La.1983).
The reviewing court, however, is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. State v. Smith, 600 So.2d 1319, 1324 (La.1992); Mussall, supra, at 1311. As noted by the Supreme Court, “the court is not to substitute its judgment of what the verdict should be for that of the jury, but at the same time the jury cannot be permitted to speculate if the evidence is such that reasonable jurors must have a reasonable doubt.” Mussall, supra, at 1311 (citation omitted). Although a conviction based solely on the identification testimony of one witness may withstand a sufficiency of the evidence test, it will do so only “[i]n the absence of internal contradiction or irreconcilable conflict with physical evidence .... ” State v. Gipson, 26,433, p. 2 (La.App. 2 Cir. 10/26/94), 645 So.2d 1198, 1200.
800 So.2d at 1120-1121.
In the instant case, the defendant’s conviction rests solely on his identification by one witness. No physical evidence or other corroborating evidence was submitted to establish his guilt.
In Brealy this Court examined the reliability of the identification according to the test set out in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), where the Supreme Court listed five points of consideration; they are as follows:
*379 (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’ degree of attention; (3) the accuracy of the witness’ prior description of the assailant; (4) the level of certainty demonstrated by the witness; and, (5) the length of time between the crime and the confrontation.
800 So.2d at 1121.
Examining McBride’s testimony in light of these factors, we note that McBride recognized Coleman when McBride first saw him on the street, and there |7was some apprehension because the victim suggested they leave the area. Furthermore, from his position in the back seat of the van, McBride observed the defendant take a gun from his pocket as he walked toward the van the victim was driving. Although McBride initially testified that he saw Coleman open fire on the van and later that he did not see Coleman shooting at the van because he ducked down, McBride consistently maintained that he saw Coleman take the gun from his pocket and move toward the van. As to the second factor, McBride’s attention was obviously focused on the defendant as he approached the vehicle with a gun in his hand and then began firing. Concerning the third factor, the accuracy of the description, we find McBride’s description specific and accurate. At the time of the offense, McBride described the defendant, according to Detective Brazley, as a “light skinned black male, approximately twenty years of age, being very hairy, and very long side burns [sic].” Later at the police station, McBride gave another officer a description of the gunman, which was included in the police report. According to that description, the gunman was
five feet eight inches tall, light brown complexion, about four to six gold teeth, sideburns, curly hairy [sic], navy blue shorts, blue and black stripped [sic] shirt and a blue or black cap.
As to the fourth factor, McBride testified that he saw Elton Coleman almost daily, and he never wavered in his degree of certainty about the identity of the gunman. Finally, McBride chose the defendant’s picture from a photo lineup on April 2, 1998, just two weeks after the crime.
Having established that the testimony of the eyewitness satisfies the five-factor test, this Court must also consider that the jury made a credibility determination in choosing to accept McBride’s testimony. We conclude that the lstestimony of this eyewitness is sufficient for the State to meet its burden of negating any reasonable possibility of misidentification and of proving beyond a reasonable doubt that the defendant committed this crime.
CONCLUSION
For the foregoing reasons, we find that there was sufficient evidence to support defendant’s conviction for first-degree murder.
Therefore, the defendant’s conviction and sentence are affirmed.
AFFIRMED.

. Hamilton was promoted to the rank of detective after this incident; he was an officer in March of 1998.

. Without designating the issue as an assignment of error, the defendant points out that the testimony of McBride and Harrison as well as the firearm expert's testimony indi *378 cates that there was a second gunman as though Coleman would be absolved of his role of principal by these facts. However, the issue of the second gunman is not material to Coleman’s innocence or guilt.

. In State v. Brealy the defendant's conviction was reversed because of the trial court's error in denying the defendant's motion in limine.